IN THE COURT OF CRIMINAL APPEALS


OF TEXAS







No. PD-1802-09






ERIC DESHON SORRELLS, Appellant



v.


THE STATE OF TEXAS





On Discretionary Review of 


Case No. 13-07-00633-CR


of the Thirteenth Court of Appeals,


Travis County






 Womack, J., delivered the opinion of the unanimous Court.



 A Travis County jury convicted the appellant, Eric Deshon Sorrells, of aggravated
robbery. On appeal, the Thirteenth Court of Appeals (1) found that the evidence was insufficient to
support a conviction of aggravated robbery, and reformed the judgment to reflect conviction of
the lesser-included offense of assault by threat. We granted the State's petition for discretionary
review on three grounds: (1) whether the Court of Appeals properly reviewed the sufficiency of
the evidence; (2) whether the Court of Appeals properly applied the law of parties; and (3) in the
alternative, whether the Court of Appeals properly reformed the judgment. We hold that the
Court of Appeals erred in its review of the sufficiency of the evidence. We therefore need not
address the State's second and third grounds. We will reverse the Court's decision and remand
for consideration of the appellant's remaining claims.

I. Background The following factual background is abridged from the facts described by the Court of
Appeals. In the early morning hours of January 30, 2005, Frances Reynolds waited on a curb
outside an Austin nightclub for her boyfriend, Nathaniel Rice, to retrieve her car from a nearby
parking lot. Reynolds testified that she leaned against a Mercedes SUV parked on the street. The
appellant emerged from the club wearing a black and gray sweater and a black leather jacket. He
told Reynolds to "get the f*** off the car" because she was damaging it. With gun in hand, the
appellant struck Reynolds across the side of her head, and the two began scuffling. Shortly
thereafter, Rice arrived. As Rice approached, the appellant turned, pulled back the slide of the
gun, and said, "[D]o you have a problem with me, too?" Rice punched the appellant, and the two
started fighting. A man wearing a blue "flannel-type" jacket then ran up to Rice and punched
him. Rice fell to the ground and Reynolds went for help. When she returned, the altercation had
ended. Rice told her that his jewelry had been stolen.

 Rice testified that after retrieving Reynolds's car, he drove to the front of the club and
saw three men standing near Reynolds. Rice saw Reynolds scuffling with the appellant. As Rice
approached, the appellant pulled out a gun and "cocked it at [Rice]." Rice pushed the gun out of
the way and swung at the appellant. The appellant struck back, hitting Rice with the gun. At that
moment, a man wearing a flannel jacket punched Rice in the head. Rice was knocked to the
ground and was "jumped" by multiple people. At some point the beating ceased and the
assailants dispersed. Rice then became aware that he was no longer wearing his lion medallion
necklace, which he valued at approximately $1,000. When the police arrived moments later, Rice
told them that his jewelry had been stolen.

 Kevin Fritz, a friend of Reynolds and Rice, testified that he accompanied Rice to the
parking lot to retrieve Reynolds's car. As they drove to the front of the club, Fritz saw Reynolds
arguing with the appellant. Fritz followed as Rice approached the appellant. Upon noticing Rice,
the appellant turned and pointed a gun at Rice. Rice took a swing at the appellant, and then
another man came up behind Rice and hit him in the head. A third man joined the fight; he and
the second man "jumped" Rice. Fritz then saw the appellant point the gun at Rice. Fritz ran up
and pushed the appellant. The men then turned their attention from Rice and began fighting with
Fritz. Someone hit Fritz with a gun; after being dazed and stumbling for a few seconds, Fritz
looked up and saw the three men running into the club. At some point during the altercation,
Fritz noticed Rice's lion medallion necklace on the ground.

 Officer Charles Riley testified that he was stationed nearby when he was dispatched to the
incident. Riley arrived on the scene within twenty or thirty seconds of the dispatch and saw
several people in front of the club; everyone was being loud and yelling that "someone had taken
something" and "someone had a gun." Riley learned that the gunman, a male wearing a black
leather jacket, had gone inside the club. Riley ran into the alley behind the club and saw three
people walking away from him down the alley. One of the three, Rachel Hardeman, turned and
looked at Riley. Then she removed her hand from her jacket pocket and deposited an object into
the side of a recycling receptacle. After the three were detained, Riley searched the receptacle and
found a gun. Riley also noticed that the black leather jacket Hardeman was wearing was too big
for her. Inside a pocket of the jacket, Riley found the lion medallion necklace. Both of the other
detainees were male. One, who would become appellant's co-defendant at trial, wore a blue
denim jacket. The other was the appellant, who wore a black and tan sweater but was not wearing
a jacket. 

 Reynolds, Rice, and Fritz did not identify Hardeman, but each of them identified the
appellant as the man who had been wearing the black leather jacket. (2)

 In addition to the facts described by the Court of Appeals, we find the following three
pieces of testimony to be important as well. First, Sergeant Richard Shirley testified that he also
responded to the incident, but he attempted to gain entrance through the front of the club. As he
looked into the club from the front, he saw the appellant wearing a black leather jacket and
moving towards the back. When Shirley finally made it through the club and got to the alley
behind it, he saw that three individuals had been detained. He noticed that Hardeman "did have
what appeared to be the same jacket" that the appellant had been wearing as he moved toward the
back of the club.

 Second, Rice identified the gun recovered by Officer Riley as the weapon pointed at him
by the appellant. 

 Third, Officer Brian Lloyd, called as a witness by the co-defendant's counsel, testified
without objection that Rice told him that the man with the gun and the black leather jacket took
Rice's necklace:

 [CODEFENDANT'S COUNSEL]: Sir, you had occasion to talk to Nathaniel
Rice; is that right, sir?


 [LLOYD]: I did.


 [CODEFENDANT'S COUNSEL]: Now, according to the best of your
recollection, these events had just happened; had they not, sir?


 [LLOYD]: Yes.


 [CODEFENDANT'S COUNSEL]: Now, then, in talking to Nathaniel, Nathaniel
told you, did he not, sir, that a black man had produced a gun?


 [LLOYD]: Yes.


 [CODEFENDANT'S COUNSEL]: That a black man had struck him with a gun?


 [LLOYD]: Yes.


 [CODEFENDANT'S COUNSEL]: He described that same black man as taking
his gold necklace?


 [LLOYD]: Yes.


 [CODEFENDANT'S COUNSEL]: He described that black man as wearing a
black leather jacket?


 [LLOYD]: Yes.

II. Standard of Review

 In Clayton v. State (3) we described the standard of review appropriate for addressing the
sufficiency of evidence in cases involving circumstantial evidence and the drawing of inferences
by a jury:

 When we review a court of appeals's application of the legal sufficiency standard
set out in Jackson v. Virginia (4), the relevant question is whether, after viewing the
evidence in the light most favorable to the prosecution, any rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt.
This standard accounts for the factfinder's duty to resolve conflicts in the
testimony, to weigh the evidence, and to draw reasonable inferences from basic
facts to ultimate facts. Therefore, in analyzing legal sufficiency, we determine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict. Our review of all of the evidence includes evidence that was properly
and improperly admitted. When the record supports conflicting inferences, we
presume that the factfinder resolved the conflicts in favor of the prosecution and
therefore defer to that determination. Direct and circumstantial evidence are
treated equally: Circumstantial evidence is as probative as direct evidence in
establishing the guilt of an actor, and circumstantial evidence alone can be
sufficient to establish guilt. (5) 

 To prove the essential elements of aggravated robbery in this case, the State had to show
that the appellant committed robbery as defined in Section 29.02 of the Penal Code, and used or
exhibited a deadly weapon. (6) Under Section 29.02, the robbery in this case would be proved by
evidence that, in the course of committing theft as defined in Chapter 31 of the Penal Code and
with intent to obtain or maintain control of the property, the appellant intentionally or knowingly
threatened or placed another in fear of imminent bodily injury or death. (7) The phrase "in the
course of committing theft" is defined by Section 29.01 of the Penal Code to mean "conduct that
occurs in an attempt to commit, during the commission, or in immediate flight after the attempt
or commission of theft." (8) A person commits theft under Chapter 31 if he unlawfully appropriates
property with intent to deprive the owner of the property. (9) 

III. On Appeal

 The Court of Appeals found that the evidence was insufficient to prove either that the
appellant was the perpetrator of the theft, or that the assault was committed "in the course of
committing theft." 

 With respect to the identity of the thief, the Court of Appeals found that "[b]ased on [the]
circumstantial evidence, the jury could have reasonably inferred that the jacket worn by
Hardeman belonged to [the appellant]." (10) Nevertheless, the Court found the evidence insufficient
to prove that the appellant had possession of the necklace: 

 At the time of [the appellant's] arrest, although the necklace was found in a jacket
that the jury could have inferred belonged to [the appellant], neither the jacket, nor
the necklace were found on his person; instead, Hardeman was wearing the jacket.
This evidence is insufficient to show that [the appellant] had personal possession
of the necklace at any point in time or that he asserted a distinct and personal right
to it. (11) 

 With respect to the nexus between the assault and the theft, the Court recognized that the
occurrence of a theft immediately after an assault typically supports an inference that the assault
was intended to facilitate the theft. (12) However, the Court found that the inference was negated in
the present case because the evidence revealed an alternative motive that could not be rationally
disregarded:

 In the present case, the evidence revealed that [the appellant's] motive for the
assault was to get Reynolds away from the silver Mercedes SUV and to keep Rice
from interfering. In light of the fact that (1) there is no evidence that the appellant
approached Reynolds in an attempt to appropriate her property; (2) the appellant
did not approach Rice in an attempt to appropriate his necklace; (3) there is no
evidence that the appellant was a party to theft; and (4) no words, actions, or
conduct during the commission of the assault indicate that Rice's assault was
committed to facilitate the appropriation of his necklace, a juror could not
rationally disregard that [the appellant's] only motive was to move Reynolds from
the vehicle and keep Rice from interfering.

IV. Identity of the Thief

 In Clayton we stated that an appellate court should determine whether necessary
inferences are reasonable "based upon the combined and cumulative force of all the evidence
when viewed in the light most favorable to the verdict." (13) But in this case, the Court of Appeals
analyzed only the evidence that Hardeman was wearing the appellant's jacket. 

 The Court overlooked at least two other critical pieces of evidence. To begin with, the
gun was also in the appellant's jacket pocket before being removed and tossed by Hardeman. The
gun was clearly in the appellant's possession and was used by him in the commission of the
assault. The evidence that the gun was transferred from the appellant's possession during the
assault to the appellant's jacket pocket after the assault strengthens the inference that the
necklace got in the appellant's jacket pocket after also being in the appellant's possession. 

 Furthermore, viewed in the light most favorable to the verdict, Officer Lloyd's testimony
provides direct evidence of the appellant's identity as the thief. During cross examination of
Rice, the co-defendant's counsel asked Rice, "Do you recall telling the police that the man in the
leather jacket had taken your necklaces? Do you recall telling them that?" Rice could not recall
that, so the co-defendant's counsel called Officer Lloyd to relate, without objection, Rice's
statement to him that the man with the gun and the black leather jacket had taken his necklace.
During closing argument, the co-defendant's counsel reminded the jury of this testimony. The Court of Appeals erred in failing to consider the combined and cumulative force of
all of the admitted evidence. Viewing the evidence in the light most favorable to the verdict, a
rational juror could have found beyond a reasonable doubt that the appellant committed the theft.

V. Nexus Between Theft and Assault

 In Cooper v. State, relied upon by the Court of Appeals in this case, we held that in a
robbery case the nexus between the assault and the theft is "sufficiently proven if the State proves
that the theft occurred immediately after the assault," (14) and as a general rule, "a theft occurring
immediately after an assault will support an inference that the assault was intended to facilitate
the theft." (15) In Cooper, the evidence showed that the appellant was working on a fence with his
uncle. The appellant struck his uncle from behind without warning and the two men began
struggling on the ground. When his uncle released his grip on the appellant, the appellant stood,
walked to his uncle's truck, and drove away. The appellant was found in a neighboring town
about an hour later. (16) Despite the appellant's testimony that he was hallucinating and did not
know what he was doing when he took the truck, we found the evidence "sufficient to support an
inference that the assault was committed in the course of the commission of the theft." (17)

 Cooper declined to answer comprehensively the question of "whether, and under what
circumstances, evidence of a motive other than theft can negate the natural inference that arises
when a theft immediately follows an assault." (18) Limiting our holding to the facts of the case, in
which the appellant claimed to be experiencing hallucinations, we "simply [held] that the
inference will not be negated by evidence of an alternative motive that the jury could rationally
disregard." (19) 

 In this case the Court of Appeals seems to have read Cooper to hold the inverse: any
inference that the assault was intended to facilitate the theft was negated because there was
evidence of an alternative motive which the jury could not rationally disregard. (20) But we need not
address the Court's extension of Cooper because the Court erred in concluding that the negation
of such an inference results in insufficient evidence.

 The appellant's motive in committing the assault - whether "[the appellant's] assault of
Rice was intended to facilitate the theft" (21) - may be probative of the nexus element, but it is not
itself an element of the offense of robbery. The nexus element is that the assault was committed
"in the course of committing theft," which is defined as "conduct that occurs in an attempt to
commit, during the commission, or in the immediate flight after the attempt or commission of
theft." (22)

 The State has always been able to prove robbery by force or threats committed before the
theft or attempted theft. The drafters of our present Penal Code pointed this out in their
comments to the present robbery statute: 

 Section 29.02 is broader in scope than the [former] robbery offense  because it
applies to violence used or threatened 'in the course of committing theft,' which is
defined in Section 29.01 to include not only violent conduct antecedent to a
completed theft, but also violence accompanying an escape immediately
subsequent to a completed or attempted theft.  The  use or threat of force in
escaping  broadens the scope of robbery. Here, too, the conduct is as dangerous
as force or threats antecedent to the theft." (23)


 This case is one of force antecedent to, or during, the theft. Based on Rice's testimony
that the necklace was missing immediately after the assault, and Fritz's testimony that he saw the
necklace on the ground during the course of the assault, a rational juror could draw a reasonable
inference that the assault and the theft occurred simultaneously, and thus the assault was
committed during the commission of theft.

 The evidence in this case was thus sufficient to prove both that the appellant committed
theft, and that he committed assault in the course of committing theft. We therefore reverse the
decision of the Court of Appeals and remand the case to that Court for consideration of the
appellant's remaining claims.

 

Delivered June 22, 2011.

Publish.
1. The appeal was transferred from the Third to the Thirteenth Court of Appeals.
2. Sorrells v. State, 2009 WL 3766443 at *1-3 (Tex. App. - Corpus Christi November 12, 2009).
3. 235 S.W.3d 772 (Tex. Cr. App. 2007).
4. 443 U.S. 307 (1979).
5. Clayton, 235 S.W.3d, at 778 (internal citations and quotation marks omitted).
6. See Tex. Pen. Code § 29.03(a)(2).
7. See Tex. Pen. Code § 29.02(a)(2).
8. See Tex. Pen. Code § 29.01(1).
9. See Tex. Pen. Code § 31.03(a).
10. Sorrells, 2009 WL 3766443, at *4.
11. Id., at *5.
12. Id., at *6 (citing Cooper v. State, 67 S.W.3d 221, 224 (Tex. Cr. App. 2002)).
13. 235 S.W.3d, at 778 (quoting Hooper v. State, 214 S.W.3d 9, 16-17 (Tex. Cr. App. 2007)). 
14. 67 S.W.3d, at 223.
15. Id., at 224.
16. Id., at 222.
17. Id., at 224.
18. Id.
19. Id.
20. Sorrells, 2009 WL 3766443, at *6, 2009 Tex. App. LEXIS, at *19-21.
21. Id.
22. Tex. Pen. Code § 29.01(1).
23. State Bar Committee on Revision of the Penal Code, Texas Penal Code: A Proposed Revision,
Committee Comment to Chapter 29 (1970).